# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-KA-01483-COA

DARYL FITZGERALD JOHNSON A/K/A          APPELLANT
DARYL F. JOHNSON A/K/A DARYL JOHNSON

v.

STATE OF MISSISSIPPI          APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 03/17/2016 |
| TRIAL JUDGE: | HON. LAWRENCE PAUL BOURGEOIS JR. |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: HUNTER NOLAN AIKENS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | JOEL SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 03/24/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE J. WILSON, P.J., LAWRENCE AND C. WILSON, JJ.

### LAWRENCE, J., FOR THE COURT:

¶1. Daryl Johnson was convicted by a Harrison County Circuit Court jury on March 8, 2016, of two counts of transferring cocaine. Following the jury trial, he was sentenced to serve two sixteen-year terms consecutively for a total of thirty-two years in the custody of the Mississippi Department of Corrections (MDOC), without eligibility for parole or probation. Daryl now appeals and claims the trial court committed numerous errors. After review, we affirm Daryl's convictions and sentences.

### FACTS

¶2.     Between March 13, 2014, and April 11, 2014, Tiffany Young went to the Johnson &

Johnson Motel (the Johnson & Johnson) in Gulfport, Mississippi, on four separate occasions

to purchase cocaine. Young worked for the Gulfport Police Department as a confidential

informant in an effort to discover violations of controlled substances laws. On the first two

occasions (March 13, 2014, and April 1, 2014) Young purchased cocaine from Tyrice

Johnson, Daryl Johnson's nephew.[1] The second two occasions (April 10, 2014 and April 11,

2014) she alleged that she purchased cocaine from Daryl.

¶3.     After the April 10 and April 11 transactions, Young immediately met with Gulfport

police to turn over the cocaine she purchased. She identified Daryl in a photo lineup as the

man she purchased the cocaine from. As a result of the April 10 and April 11 transactions,

Daryl was indicted on August 7, 2014, for two counts of the sale of less than two grams of

cocaine. Furthermore, the indictment charged Daryl as a second or subsequent drug offender

in accordance with Mississippi Code Annotated section 41-29-147 (Rev. 2013) and as a

habitual offender under Mississippi Code Annotated section 99-19-81 (Rev. 2007).

¶4.     The State's primary evidence against Daryl was the testimony of Young and the

surveillance of the April 11, 2014 transfer.[2] The April 11 video showed the inside of

Young's driver's side door with the window rolled down. In the video, Young was talking

---

[1] Tyrice Johnson pled guilty for the March 13, 2014 and April 1, 2014 transfers. He was also called as a witness by the defense in Daryl Johnson's trial.

[2] The record indicates that the surveillance video from the April 10, 2014 purchase malfunctioned. As a result, the only video entered into evidence and viewed by the jury was the video of the April 11 purchase.

to an African American man who was wearing a hat, glasses, and a t-shirt. The video does not show if the man had any distinguishing characteristics like gold teeth, scars, or tattoos.[3] Only the left side of the man's neck and the outside of his left arm are visible in the video. Notably, the transfer of the cocaine is not on the video. The State heavily relied on the video, Young's testimony describing what occurred, and her identification of Daryl. Daryl claimed at trial that he was not the person in the video. Instead, he claimed that it was his brother, Terry. Terry admitted at trial that he was the person on the video, but he denied that he ever sold drugs to Young.

¶5.     On March 1, 2016,[4] the defense sent its witness list to the State. The list included twelve separate witnesses, all of whom were expected to testify that the man in the video was Terry, not Daryl.[5] On March 7, 2016, the State filed a motion in limine to limit the number of witnesses the defense would call. At the hearing on March 8, 2016, the defense offered to reduce the number of witnesses it would call at trial:

> MR. HESTER:        . . . I can accept Your Honor's opinion that - - what I

---

[3] Young testified that Tyrice told her that his uncle, whom he indicated was Daryl, had gold teeth. Daryl also has a tattoo of a pistol on his left forearm, another tattoo on his neck, and some scars on his face.

[4] The trial started on March 8, 2016.

[5] At the hearing on March 8, 2016, the State told the judge that there were eleven proposed witnesses from the defense. The letter entered into evidence at the post-trial hearing however shows that a twelfth witness, Tyrice Johnson, was added by hand. It is unclear from the record when Tyrice's name was added to the typed letter. The State claimed that the first time they heard Tyrice would testify was the first day of trial on March 8, 2016. The defense did not refute this.

3

> believe will be Your Honor's opinion that eleven is excessive, not counting the defendant. And actually, we lost [a witness] to a heart attack Saturday. So I guess we're down to ten. I'd ask that you let me have at least five.

The trial court then granted the State's motion and limited the defense to three witnesses. Following the trial court's ruling, the defense asked if the court would consider an eyewitness, who was actually present at the time of the transactions, as an additional witness. The trial court initially denied the defense's request, but later in the same hearing, the court clarified that an eyewitness would not be considered in the three-witness limit. This meant that the defense was able to call three lay witnesses who would offer the same opinion that the man in the video was not Daryl. Notably, the defense never made a proffer at the hearing, nor at trial, as to exactly what the other witnesses would have testified to had they been called at trial.

¶6.     In addition to the motion to limit the number of witnesses the defense could call, the State filed another motion in limine to use Daryl's prior 1993 drug conviction to "establish that he had motive, opportunity, knowledge, and intent to sell the cocaine that was transferred" in April 2014. Additionally, the State sought to introduce evidence that when Young purchased cocaine from Tyrice on April 1, 2014, Tyrice went to Daryl to discuss the sale. The State argued that Young could identify Daryl based on that observation. The defense objected to the motion during the pre-trial hearing on March 8. The trial court, after conducting a balancing test under Rule 403 of the Mississippi Rules of Evidence to

4

determine if the probative value was outweighed by the prejudicial effect of the evidence, granted the State's motion. After the trial began, the State attempted to clarify the court's ruling. The defense objected. In response, the trial court held as follows:

> Well, yesterday we had a hearing. I specifically ordered that possession with intent would be allowed in because it goes to intent, **but all the other charges, simple assault and the aggravated assault and I believe there was even possession, none of that will be allowed in.**

(Emphasis added). The defense again objected and argued that the 1993 possession of controlled substance with the intent to distribute was highly prejudicial. The trial court overruled the objection.

¶7. Young testified at length during the trial. She told the jury that the first time she went to the Johnson & Johnson she met Tyrice, who sold her cocaine. It was during that first interaction with Tyrice that Young met Daryl. She told the jury "Ty[rice] introduced us, and he said that this was his uncle, and when I come back I could deal with his uncle." Young testified that Tyrice identified his uncle as "Roughhouse." Tyrice also told Young that his uncle had a "white cap with gold teeth" and owned the Johnson & Johnson.[6]

¶8. Young testified that on April 10, 2014, before going to the Johnson & Johnson, she met with officers from the Gulfport Police Department. She testified that the police searched her car and person to ensure she had no drugs on her, gave her a recording device, and handed her one hundred dollars to buy cocaine from Daryl. When she arrived at the Johnson

---

[6] It was uncontested at trial that Daryl owned the Johnson & Johnson.

5

& Johnson, Young testified that she saw "D.J." there.[7] She spoke with "D.J." and purchased cocaine from him. She then returned to the Gulfport police officers and identified "D.J." as Daryl from a photo lineup.

¶9. The next day, April 11, 2014, Young met with Gulfport police again. The police searched her car, gave her a recording device, and handed her one hundred dollars to buy cocaine. She then testified she went back to the Johnson & Johnson. Young's testimony was as follows:

> Q. And who did you meet up with?
>
> A. D.J.
>
> Q. Did you meet him inside again, or did you meet him outside somewhere?
>
> A. Outside.
>
> Q. And where did you meet him outside?
>
> A. Out back.
>
> Q. Is there a back alley or a back parking lot?
>
> A. It's like a back parking lot.
>
> Q. Okay. Now, who did you see when you pulled up?

---

[7] The video recording from the April 11, 2014 transfer indicates that when Young returned to the police officers, they asked her whom she made contact with. Young responded, "[U]h Roughhouse, D.J." The defense argued at trial that "Roughhouse" was Terry's nickname, not Daryl's, and that Daryl did not go by the nickname "D.J." The State, however, maintained that "Roughhouse," "D.J.," and Daryl were all the same person.

A. There were random people on the side. He came out of the apartment complex, I believe.

Q. You said "he." Who came out?

A. D.J.

Q. D.J. And he came to your vehicle?

A. Yes.

Q. What happened when he came up to the car?

A. We talked for a few minutes. I gave him the money. He gave me the drugs. And I told him I'll see him later, I'll call him later, and I left.

Young's testimony matches the video of the April 11 transaction, which was entered into evidence at trial.

¶10. Young told the jury that after she purchased cocaine from "D.J." a second time, she went back to the Gulfport police officers, gave them the cocaine, and picked Daryl out of a photo lineup. At trial, Young again identified Daryl as the man in the video that she purchased cocaine from on April 11, 2014. The State asked Young if she knew Daryl's brother, Terry Johnson, and if she had ever purchased cocaine from Terry. Young responded she had "briefly" seen Terry at the Johnson & Johnson, but it was Daryl and not Terry from whom she purchased cocaine. On cross-examination, the defense extensively questioned Young about her identification. She maintained that it was Daryl in the video and Daryl who sold her cocaine on April 10, 2014, and April 11, 2014.

¶11. Detective Joey Wuest testified that he worked with Young during the April 10 and

7

April 11 transactions. During his cross-examination, Detective Wuest was asked if he knew Daryl. Detective Wuest responded that he had seen Daryl and had "dealings" with him on prior occasions. Detective Wuest then proceeded to tell the jury that he was sure that the person in the video was Daryl. While on re-direct, Wuest testified that he had contacted Daryl in the past and was very familiar with him. Specifically, Detective Wuest told the jury that Daryl went by both "D.J." and "Roughhouse" socially. His exact testimony was as follows:

> Q. In your law enforcement experience, how many, I guess, contacts have you had with this defendant?
>
> A. Oh, I would say throughout my years at [the Gulfport Police Department], I've contacted him or had interaction with him I would say at least [twenty] times.
>
> Q. And those [twenty] times are all through your employment, correct?
>
> A. Yes.
>
> Q. It's not socially?
>
> A. No. No.
>
> Q. Now, there was also discussions about his nicknames.
>
> A. Yes.
>
> Q. And to your knowledge, what are the defendant's nicknames?
>
> A. D.J. and Roughhouse.

It is important to note that the defense did not object to the testimony.

¶12. Sergeant Aaron Fore worked for the Gulfport Police Department. Sergeant Fore also

8

testified for the State. Sergeant Fore told the jury that he had been to the Johnson & Johnson's location "hundreds and hundreds, maybe a thousand times." The reason Sergeant Fore had for visiting the Johnson & Johnson was because of "drug related street level enforcement or narcotics investigations." Sergeant Fore also testified that it was Daryl on the April 11 video. Again, the defense never objected to this testimony.

¶13. The other law enforcement officer to testify was Sergeant Adam Gibbons. Sergeant Gibbons was a sergeant with the Gulfport Police Department. Sergeant Gibbons told the jury that he had encountered Daryl on numerous occasions. He identified Daryl as the man in the April 11 video based on those prior dealings with him. When asked if he knew Daryl by any other name, the following exchange occurred:

> Q.  Are you aware whether or not Mr. Johnson has any nicknames?
>
> A.  Over several years I've heard many nicknames referred to him. I've heard him called Daryl, I've heard him called Big D, Roughhouse, and D.J.
>
> Q.  In your experience in the majority of your [sixteen] years with law enforcement, is it common for people involved with dealings narcotics to have multiple nicknames?
>
> A.  Yes, sir.
>
> Q.  And why would that be, if you know?
>
> A.  I can give you my opinion of why that is. My opinion is it's to hide or conceal, try to conceal identity. You don't want to give your real name of course. That would just help law enforcement. . . .

Again, the defense did not object to this line of testimony.

9

¶14. The defense presented a case of misidentification. Several family members testified on Daryl's behalf and told the jury that it was Terry in the April 11 video, not Daryl. Terry testified and told the jury it was him in the video, but he never sold drugs to Young. Tellingly, however, Terry also told the jury that he did not have gold teeth or tattoos on his left arm—two of the physical characteristics Young used to identify Daryl during the April 10 and April 11 transactions. Daryl also testified at trial. He maintained his innocence and that this was a case of misidentification.

¶15. After hearing all of the testimony presented, the jury found that Daryl was guilty of both counts. Daryl was sentenced to two consecutive sixteen-year terms in the MDOC's custody without eligibility for parole or probation. Aggrieved, Daryl filed this direct appeal.

**ANALYSIS**

I. **Whether the State had a duty to disclose a recording from Tiffany Young's interaction with Tyrice Johnson, Daryl's nephew.**

¶16. Daryl first alleges a violation of his due process rights because the State failed to surrender recordings from Young's initial transactions with Tyrice on March 13, 2014, and April 1, 2014. Daryl claims that this evidence is exculpatory and should entitle him to a new trial. After Young testified, the State called Detective Wuest. During Detective Wuest's cross-examination, the following occurred:

Q. Would you want to work with a confidential informant that was a regular user of narcotics, sir?

A. No, sir, I would not want to.

10

MR. HESTER:      Thank you.

THE COURT:       All right.  Before we go any further, y'all approach.

(BENCH CONFERENCE NOT REPORTED)

THE COURT:       Mr. Wehrman, take the jury out.

(JURY OUT)

THE COURT:       All right.  While this witness is still on the stand, the defense attempted to make questions or refer to some tape.  I don't know what tape it is, but it was also said by the state.  They objected.  It was a rule violation, a discovery violation.  Such being the case, we're going to follow the rule.  **So we're going to take a break right now and allow the state to review the tape, give them an opportunity, and then we'll go from there.**

MR. HESTER:      Thank you.

THE COURT:       All right.  We're in recess.

(Emphasis added).  The State was then given the opportunity to review the recording.  The

trial court clearly thought the discovery violation was by the defense, yet Daryl still argues

that the discovery violation prejudiced him—not the State.  In that regard, the State made the

following argument after the recess:

MR. BURRELL:     Your Honor, I think it's a blatant discovery violation on the part of the defense.  They've had this case and that audio since sometime in 2015.  It's on a separate case.  They never divulged this to the state that they were going to use this audio, nor they were going to call Tyrice Johnson until yesterday.  They've known about this for a long time, Judge.

¶17.   Daryl claims that the recordings of the March 13 and April 1 transfers between Young

11

and Tyrice should have been given to the defense during discovery. The record indicates that the recordings from those transfers indicate Young could not tell Daryl and Terry apart, which was the basis of the defense's theory. These videos, however, were evidence in the case against Tyrice for possession, not Daryl. The same attorney, Michael Hester, represented both Tyrice in his case regarding the March 13 and April 1 transfers and Daryl in his trial for the April 10 and April 11 transfers.[8] Because Hester represented both men in their respective trials, he would have had access to the recordings from the March 13 and April 1 transfers that Daryl maintains the State should have produced. In fact, the trial court questioned Hester about that very subject:

THE COURT:     And when did you find this tape?

MR. HESTER:     An hour ago I heard the -- we went back to Tyrice's old file, found Tyrice's old tape, played it, and I think it's the last sentence on the tape.

THE COURT:     Did you represent Tyrice?

MR. HESTER:     I did.

The record indicates that while Tyrice reviewed the tape before he pled guilty to crimes depicted on the tape, he never reviewed it with Hester. The trial court afforded the State an opportunity to interview Tyrice. The State reported back to the trial court that Tyrice knew what Young said but that "[Daryl's attorney] was not aware apparently until [the day of trial] of what Ms. Young said in the audio." The State withdrew its motion and objection. At this

---

[8] Before Daryl's trial, Tyrice pled guilty to his charges and did not go to trial.

12

point, the defense was free to introduce the tape without objection but chose not to.

¶18.    The State argued that there was no discovery violation because the State had indicated in discovery that Young would testify to the fact that Tyrice introduced her to Daryl.  The State correctly pointed out that "the proper time to cross-examine [Young] on any of her previous statements would have been when she was on the stand when he had the opportunity to cross-examine her."  Notably, Hester never cross-examined Young, who had testified before Detective Wuest, about the alleged statements to Tyrice or used the statements for impeachment purposes.  More important, Hester never called Young back to the stand despite having requested the court not to release her from her trial subpoena.  At trial, after Young's direct, cross-, and re-direct examination, Young left the courtroom and proceeded to the normal location where witnesses stayed while a trial was ongoing.  Hester objected and told the trial court he "asked that she stay" at the courthouse.  The defense could have called Young back to the stand and questioned her further but chose not to do so.

¶19.    The tapes were readily available to Daryl's attorney before trial. Hester acknowledged at trial that he actually found the tape inside of Tyrice's case file, which was in his possession.  The trial court correctly applied Rule 9.04(i)(2) of the Mississippi Uniform Rules of Circuit and County Court Practice[9] to this issue and found the defendant was in possession of the tape in question and could have introduced it at trial.  This issue is without

---

[9] This same rule was carried over into new rules and is now Rule 17.9 of the Mississippi Rules of Criminal Procedure.

13

merit.

**II. Whether the trial court abused its discretion in limiting the defense's lay witness testimony.**

¶20. Daryl next claims that it was error for the trial court to limit the number of lay witnesses the defense could call to testify. When reviewing issues where evidence was either excluded or admitted during trial, this Court utilizes an abuse of discretion standard of review. *Williams v. State*, 174 So. 3d 275, 278 (¶16) (Miss. Ct. App. 2014) (citing *Williams v. State*, 991 So. 2d 593, 597 (¶8) (Miss. 2008)). When limiting evidence, the trial court is duty-bound to weigh "whether the interests served by a rule justify the limitation imposed on the defendant's constitutional right to [present his defense]." *Rock v. Arkansas*, 483 U.S. 44, 56 (1987). As a result, trial courts in this State must "insure the constitutional right of the accused to present a full defense in his or her case." *Ross v. State*, 954 So. 2d 968, 996 (¶56) (Miss. 2007).

¶21. Daryl specifically argues that "the trial court arbitrarily deprived [him] of his right to present a complete defense by limiting the defense to three lay witnesses to testify that the man in the video was Terry, not Daryl." Before trial, Daryl's witness list indicated that twelve[10] separate people would testify that the man in the video who sold Young drugs on April 11, 2014, was Terry, not Daryl. The State moved in limine under Rule 701[11] to limit

---

[10] Eleven witnesses were listed on the typed letter addressed to the State; one additional witness was added by hand.

[11] M.R.E. 701.

14

the number of witnesses offering opinion testimony as to identity. The following exchange

occurred regarding the motion in limine:

THE COURT: . . . It's the cornerstone of the case, though, is the identity of the defendant. So I will allow [lay witness] testimony only if [the witnesses] are familiar with the defendant, but I'm not going to allow ten or eleven or even five. I think I'm going to limit it to three. Pick your best three, Mr. Hester. All right. Anything else, state?

MR. HESTER: Your Honor, I would ask that if one of them were to testify that he was actually present at the time of the occurrence, would you allow him as an additional, giving us four?

THE COURT: No. Just three. That's all. I'm limiting it to three. All right. . . .

. . . .

THE COURT: Also, I want to reiterate something I said, or reverse myself on something I said earlier. With regard to lay witness opinions, I said I was limiting it to three. I am limiting it to three. However, Mr. Hester said, as I'm thinking about it, that he had an eyewitness. That's not opinion testimony, eyewitness[es]. He was present. So he can put three and whoever that person is.

MR. McCORMICK: I'll agree with that.

THE COURT: Just sitting here listening to y'all. Do y'all understand the ruling now?

MR. HESTER: I do, Your Honor.

At trial, the defense called three lay witnesses to offer their opinions on the misidentification.

The defense never proffered the intended testimony of any of the other individuals they

15

intended to call before the trial court's ruling. The record is devoid of exactly what each of the witnesses listed on the defense's witness list would have testified to.

¶22. This Court has held that an appeal of a trial court's limitation of evidence, without a proffer from the defendant as to the nature of the evidence in the record, was not reversible error. *Williams v. State*, 281 So. 3d 263, 271 (¶19) (Miss. Ct. App. 2019) (finding it "impossible" to find error in the trial judge's ruling to limit improper character evidence because the defense failed to offer a "proffer of the nature of the character evidence"). "When a trial court rules so as to prevent certain testimony from being introduced, it is incumbent on the party to make a proffer of what the witness would have testified to or the point is waived for appellate review." *Turner v. State*, 732 So. 2d 937, 951 (¶55) (Miss. 1999). Daryl failed to make a proffer on the record to alert the trial judge as to exactly what each individual witness was expected to say and why he would need numerous witnesses to say the exact same thing. As a result, this issue is waived for appellate review, and we find no error in the trial court's exclusion.

¶23. Notwithstanding the waiver issue, Mississippi Rule of Evidence 611 provides the trial court with control over the acceptance of testimony. Rule 611(a) reads as follows:

(a) Control by the Court; Purposes:

The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to:

(1) make those procedures effective for determining the truth;

(2) **avoid wasting time; and**

16

(3) protect witnesses from harassment or undue embarrassment.

(Emphasis added). Here, the trial court was presented with Johnson wanting to call ten witnesses to apparently say exactly the same thing.[12] The trial court allowed Johnson to chose three witnesses to testify, and there is nothing in the record to indicate that was an abuse of discretion. Therefore this issue is without merit.

### III. Whether the State committed prosecutorial misconduct.

¶24. Daryl claims numerous instances of prosecutorial misconduct on appeal that allegedly deprived him of his constitutional right to receive a fair trial. When this Court reviews a claim of prosecutorial misconduct, we must consider reversal if the "prosecutorial misconduct endangers the fairness of a trial and the impartial administration of justice[.]" *Catchings v. State*, 39 So. 3d 943, 947 (¶10) (Miss. Ct. App. 2009) (quoting *Goodin v. State*, 787 So. 2d 639, 653 (¶41) (Miss. 2001)). "The standard of review which appellate courts must apply to lawyer misconduct during opening statements or closing arguments is 'whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created.'" *White v. State*, 228 So. 3d 893, 904 (¶28) (Miss. Ct. App. 2017) (quoting *Wilson v. State*, 194 So. 3d 855, 864 (¶30) (Miss. 2016)).

---

[12] The degree to which the ten witnesses would have differed or added additional facts to the defense are not developed in the record, as the defense never proffered the testimony. Johnson did not dispute that the ten witnesses were essentially saying the same thing.

¶25. This Court has held in the past that "[u]nder the cumulative-error doctrine, 'individual errors, which are not reversible in themselves, may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial.'" *Harding v. State*, 17 So. 3d 1129, 1133 (¶13) (Miss. Ct. App. 2009) (quoting *Ross v. State*, 954 So. 2d 968, 1018 (¶138) (Miss. 2007)). Likewise, the supreme court has made it clear that the failure to contemporaneously object will result in a waiver of the issue on appeal. *Walker v. State*, 913 So. 2d 198, 238 (¶148) (Miss. 2005). Notably, each of the below-mentioned claims of prosecutorial misconduct were without objection by the defense. While the comments made by the prosecutor during the cross-examination of Tyrice and the closing argument are inappropriate, and potentially violative of the trial court's exact rulings, such errors must be contemporaneously objected to at trial to preserve the issue on appeal. That was not done in any of the instances that Daryl now raises for the first time on appeal. With that in mind, we now turn to address each of Johnson's separate claims of prosecutorial misconduct.

**A.      Recordings from Young's Previous Interactions with Tyrice**

¶26. Daryl argues that the State committed prosecutorial misconduct by failing to disclose the recordings from Young's interaction with Tyrice. As discussed more fully above, Daryl's defense counsel had access to both the recordings as a result of representing Tyrice in his separate case. Daryl's defense counsel realized their significance on the first day of Daryl's trial. For the reasons more fully discussed above in part I, this was not an omission by the

18

State and, therefore, was not misconduct that prevented Daryl from receiving a fair trial.

### B. Young's Speaking to Witnesses After Her Testimony

¶27.    Daryl's next claim of prosecutorial misconduct involves an exchange after Young testified at trial.  After Young's testimony, the court was in recess, and the jury was out of the courtroom.  Once the court was back on the record, the defense alleged that during the recess, Young had gone to the district attorney's office and was speaking to other witnesses who had yet to testify.  The defense had instructed a woman named Ashley McKnight to follow Young from the courthouse after her testimony.  McKnight told the trial judge that she did not know what Young and the other people in the room spoke about and could not identify who the people in the room with Young were.  The trial court instructed the State to "instruct their witnesses not to discuss the case" and clarified for the record that the area Young went to after her testimony is where all witnesses for the district attorney's office were normally kept.  There is no evidence in the record that anyone in the room discussed Young's courtroom testimony.  This was not prosecutorial misconduct, and Daryl was not prejudiced.

### C. Police Testimony

¶28.    Daryl argues it was error for the State to present evidence of how law enforcement knew him or knew of the Johnson & Johnson.  During Detective Wuest's re-direct examination, he testified that he had encountered Daryl "at least [twenty] times" throughout his employment. The defense did not object to Detective Wuest's answer.  Additionally,

Sergeant Fore testified he had been to the Johnson & Johnson "hundreds and hundreds, maybe a thousand times" before and that it was because of "drug related street level enforcement or narcotics investigations." Again, the defense did not object. Lastly, the defense argues that Officer Gibbon's testimony was also prejudicial because he told the jury he had encountered Daryl before and could identify the man in the April 11 video as Daryl based on those previous encounters.

¶29. Failure to object on the record with specificity and preserve the record at trial for appeal results in a waiver of the issue on appeal. *Pustay v. State*, 221 So. 3d 320, 346 (¶73) (Miss. Ct. App. 2016) (citing *Stevens v. State*, 458 So. 2d 726, 730 (Miss. 1984)). What's more, "[r]egardless of any waiver, [Daryl's] failure to object precluded the trial court from considering the admissibility of the evidence." *Id*. Based on a review of the record, the State asked those questions in order to cement for the jury how the different law enforcement officers would have known that the man in the April 11 video was Daryl and not Terry in a trial where the accused claimed he was not the person in the video. The officers are allowed to explain how and why they can identify Daryl on the video. That information goes to the officer's credibility, and the defense certainly had every opportunity to cross-examine the officers on their testimony. Therefore this issue is without merit.

### D. Johnson's Prior Convictions

¶30. Daryl claims two instances of prosecutorial misconduct regarding his prior convictions: (1) that it was improper to elicit testimony from law enforcement about

Johnson's prior convictions during the cross-examination of Tyrice; and (2) that it was error for the State to comment on his prior convictions and sentences during closing argument. During Tyrice's testimony and during the State's closing argument, the defense failed to object.

¶31.     As noted above, the State's motion to allow evidence of Daryl's prior convictions was clarified by the trial judge before the trial began:

> Well, yesterday we had a hearing. I specifically ordered that possession with intent would be allowed in because it goes to intent, **but all the other charges, simple assault and the aggravated assault and I believe there was even possession, none of that will be allowed in.**

(Emphasis added). The trial judge's clarification made clear that any reference to another charge, besides possession with intent, would be excluded. However, during the trial, a witness called by the defense first testified about Daryl's previous convictions. During Tyrice's direct examination, the following exchange occurred:

Q.     Do you know the man seated at that table over there?

A.     Yes, sir.

Q.     Who is he?

A.     My uncle Daryl Johnson, also known as D.J.

Q.     How long have you known D.J.?

A.     **Well, due to the fact that he was incarcerated for [fifteen years] when I was born, I knew him just going** - -

THE COURT:     Wait a minute. Stop. Come up.

21

(BENCH CONFERENCE NOT REPORTED)[13]

THE COURT:    You can answer the question.  Answer the question, sir.

A.    I've been knowing him all my life, sir.

(Emphasis added).  That was the only time on direct examination that Tyrice mentioned Daryl's prior convictions.  During Tyrice's cross-examination, the following exchange occurred:

Q.    Now, you said a minute ago that the defendant had been in jail for about [fifteen] years, correct?

A.    Yes, sir.

Q.    And that was for possession with intent, correct?

A.    I was a baby.  I don't know what the charges were, sir.

Q.    Simple assault on a law enforcement officer, correct?

MR. HESTER:    He testified he didn't know, Your Honor.

MR. BURRELL:    That was just that one specific charge, Judge.

THE COURT:    He said he didn't know.  Move on.

Q.    So you don't know what he was in jail for for [fifteen] years?

A.    Yes, Sir.

Q.    Okay. Well, what as that?

---

[13] The record does not indicate what was said during the bench conference, and we do not have the advantage the trial lawyers had after that bench conference to know the content.

22

A.      I want to say it was some kind of drug charge when I was young.  But he went to jail on another charge too for a year.

Q.      Okay. What charge was that?

A.      I want to say simple assault or assault on somebody.  Something like that.

Q.      Okay. Would that be aggravated assault?

A.      I'm not sure.

Q.      So he's just been in jail -- tell me this. You said he'd been in jail [fifteen] years ago.  You don't know what he's in jail for?

A.      I didn't say he was in jail [fifteen] years ago.

Q.      Okay. For [fifteen] years?

A.      Yes, sir.

Q.      Okay. Okay. I'm sorry.  I misunderstood you, Mr. Johnson.  But you don't know what he was in jail for?

A.      Which time, sir?

Q.      Oh, so he's been to jail a couple of times?

A.      Prison.

Q.      Okay.  What else -- when else did he go to prison?

A.      I say he just got out recently about a good year ago.

Q.      Okay.  Do you know what for?

A.      That's on the assault charge.

There was no objection from the defense.

23

¶32.   Finally, while in closing argument, the State attacked Daryl's credibility in front of the jury several times:

> [Tyrice] got in showing how this defendant is a habitual criminal.  You heard that. [Daryl] [s]pent [fifteen] years in jail. [Tyrice] really didn't know him. And then [Daryl] came out, and then [Daryl] went back in.
>
> . . . .
>
> [Daryl's] a habitual criminal.  I go up.  I go in.  I come out.  I commit crimes. I go back in.  I come out.  That's his pattern.  That's his life, ladies and gentlemen.  You heard about his history.
>
> . . . .
>
> [The police] take an oath to protect us from guys like him, from drug dealers like him.
>
> . . . .
>
> We know this defendant can't follow the law, because you've heard about his criminal history.

Once again, there was no objection from the defense to any of these statements during the closing argument.

¶33.   "In general, the failure to object to the prosecution's statements in closing argument constitutes a procedural bar."  *White*, 288 So. 3d at 907 (¶40) (quoting *Ross*, 954 So. 2d at1001 (¶71)).  "The contemporaneous objection rule is in place to enable the trial court to correct an error with proper instructions to the jury whenever possible." *Walker v. State*, 913 So. 2d 198, 238 (¶148) (Miss. 2005) (citing *Gray v. State*, 487 So. 2d 1304, 1312 (Miss. 1986)).  It is indisputable that the failure to object at trial is a fatal flaw on appeal. *Williams*

24

*v. State*, 512 So. 2d 666, 672 (Miss. 1987); *see also Box v. State*, 610 So. 2d 1148, 153-54 (Miss. 1992) (noting a defendant's failure to object to the prosecutor's remarks in closing argument, while followed by a motion for mistrial after the jury verdict, was deemed "too late"); *Coleman v. State*, 378 So. 2d 640, 649 (Miss. 1979) (noting a defendant's failure to object to the State's comments in closing argument, regardless of a motion for mistrial after the jury retired, was considered untimely).

¶34. The prosecutor's statements are alarming and stray from permissible advocacy arising in the heat of battle during a trial. However, the Mississippi Supreme Court and this Court have refused to address claims of prosecutorial misconduct where the trial counsel failed to object. Daryl's trial counsel never objected or moved for a mistrial when the information came before the jury at trial. Rather, the objection comes now on appeal. It is important to note that during the sentencing hearing, Daryl's trial counsel indicated the following:

> When young Tyrice got up here and testified and opened the door for them to bring in all that information, I thought it was helpful to the jury's understanding of this matter because it shows [the police] had reason to target him.

That would indicate that the lack of an objection was trial strategy and that the information now complained of was intentionally allowed into evidence to provide further arguments to the jury of misidentification.

¶35. Procedural bar notwithstanding, we note that the first time Daryl's prior convictions or incarcerations were ever mentioned was during the direct examination of a witness called by the defense. During Tyrice's direct examination by the defense, he announced that Daryl

25

had previously served fifteen years in jail. Further, when Daryl testified it was again his attorney who engaged in a question-and-answer session about Daryl's criminal past. It seems somewhat inconsistent now to object on appeal to the information not objected to at trial, which the jury first heard on direct examination during the defense's case-in-chief. As a result, Daryl's failure to preserve this issue for appeal and his failure to move for a mistrial was, in part, apparently trial strategy as admitted by his trial counsel.

¶36. Again, procedural bar notwithstanding, an analysis of the prosecutor's comments under the plain-error doctrine does not warrant reversal. In *Ambrose v. State*, 254 So. 3d 77, 129 (¶¶161-62, 166-67) (Miss. 2018), *cert. denied*, 139 S. Ct. 1379 (2019), the Mississippi Supreme Court stated:

> "[T]he plain-error doctrine is applied to closing arguments only when the substance of the statement is out of bounds for closing arguments." *Boyd v. State*, 977 So. 2d 329, 337 (¶34) (Miss. 2008); *see also Minor v. State*, 831 So. 2d 1116, 1123 (¶¶22-23) (Miss. 2002). Moreover, the "plain error doctrine has been construed to include anything that seriously affects the fairness, integrity or public reputation of judicial proceedings." *Boyd*, 977 So. 2d at 338. We also have held that a defendant could not be prejudiced by unnecessary and inappropriate prosecutor statements when the evidence presented was insurmountable. *Franklin v. State*, 136 So. 3d 1021, 1032 (¶40) (Miss. 2014).
>
> Normally, "[t]he standard of review that appellate courts must apply to lawyer misconduct during opening statements or closing arguments is whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." *Jackson v. State*, 174 So. 3d 232, 236 (¶9) (Miss. 2015); *see also Sheppard v. State*, 777 So. 2d 659, 661 (¶7) (Miss. 2000). "**Even when a prosecutor has made an impermissible comment, this Court requires a showing of prejudice to warrant reversal.**" *Outerbridge v. State*, 947 So. 2d 279, 286 (¶23) (Miss. 2006).

. . . .

In *Jackson*, the Court noted that "even without the defendant attorney's objection, 'unwarranted and improper remarks of a district attorney would warrant reversal where there was "most extreme and intolerable abuse of his privilege.'" *Jackson*, 174 So. 3d at 236 (¶11) (quoting *Randall v. State*, 806 So. 2d 185, 221 (¶101) (Miss. 2001)). Thus, we have held that "in extreme cases, a failure to object to questions which were violative of a constitutional right will not act as procedural bar to consideration." *Jackson*, 174 So. 3d at 237 (¶13). Recently in *Evans*, we applied the so inflammatory standard of review because the defendant's failure to object during the prosecutor's closing arguments operated as a procedural bar on appeal. *Id*. The application of the so inflammatory standard is in accord with the Court's concern that "the failure to contemporaneously object would never operate as a waiver." *See O'Connor*, 120 So. 3d at 401 (¶29).

Based on the foregoing, the Court reviews whether the alleged prosecutorial misconduct was so inflammatory that the trial court should have intervened on its own. *Evans*, 226 So. 3d at 31 (¶78); *O'Connor*, 120 So. 3d at 400-01 (¶29). "Attorneys generally are afforded wide latitude in arguing their cases to the jury." *Ronk v. State*, 172 So. 3d 1112, 1137 (¶60) (Miss. 2015). "**Any allegedly improper prosecutorial comment must be considered in context, considering the circumstances of the case, when deciding on their propriety**." *Id*.

(Emphasis added). Here, the prosecutor's comments must be considered "in context, considering the circumstances of the case." *See Ronk*, 172 So. 3d at 1137 (¶60). The prosecutor's comments concern Johnson's criminal history. Johnson's attorney at trial did not object to that information and as previously indicated apparently had decided that information assisted him in the defense by claiming the police "target[ed]" Johnson. In other words, the defense argued that it was not Johnson on the recording but his brother and that the police targeted Johnson because of his criminal past. The defense now claims error on appeal for the State's closing argument that simply addressed and responded to an argument

27

the defense apparently wanted and used at trial. In review of the entire record it does not appear that the closing arguments of the prosecutor were "so inflammatory" nor has the defendant shown prejudice from the "insurmountable" evidence that was presented at trial. Therefore, this issue is without merit.

### E.    The State's Closing Comments on the Defense's Witnesses

¶37.    Daryl finally argues that it was prosecutorial misconduct for the prosecutor to comment on the motivation of Daryl's family members to lie while testifying that it was Terry in the video, not Daryl. During closing arguments, the prosecutor said:

> Let's talk about the defense witnesses they brought up here today. All family members. All family members. Talk about bias versus unbiased witnesses? You heard from his sister, his brother, his nephew, and a cousin. I think that should tell you a lot right there, ladies and gentlemen. They couldn't bring anybody else in. That's all they brought you was family members. You know family's going to stick together. They're going to do whatever they can for each other. . . . They're not unbiased. They have a vested interest in this case.

Once again, the defense did not object.

¶38.    "[T]he very purpose of an advocate is to help the jury draw conclusions from the evidence and to make suggestions as to the proper conclusion." *Evans v. State*, 725 So. 2d 613, 671 (¶243) (Miss. 1997) (quoting *Blue v. State*, 674 So. 2d 1184, 1208 (Miss. 1996), (*overruled on other grounds by King v. State*, 784 So. 2d 884, 889-90 (¶¶20-23) (Miss. 2001)). In making their argument to a jury, prosecutors are "entitled to argue inferences based upon evidence presented at trial, and it is appropriate for the prosecutor to draw inferences without stating his personal opinion." *Walker v. State*, 913 So. 2d 198, 239 (¶152)

28

(Miss. 2005) (citing *Evans*, 725 So. 2d at 671)).  Prosecutors are certainly entitled to argue

the potential biases of witnesses in closing arguments.  While this issue is barred because the

defense failed to make an objection, the prosecutor did not commit misconduct because he

merely argued to the jury reasonable inferences from the evidence.  We do not find that to

be reversible error.

### IV. Whether the trial court erred by preventing Daryl from displaying his arm tattoos to the jury during deliberations.

¶39.    Daryl claims that the trial court committed reversible error by denying him the right

to display his arm tattoos for a second time before the jury, after the close of the evidence at

trial.

¶40.    During jury deliberations, the jury had questions concerning any birthmarks or tattoos

Daryl may have had.  The trial court required the jury to go back in the courtroom.  The

following exchange occurred:

> THE COURT:    The jury sent out a note. ["]Daryl birthmark scar on what arm/hand and where and describe." I'm going to bring the jury back in and inform them, "You have received all the evidence and been instructed as to the law.  Continue your deliberations."  State, do you have any objection to that action?

> MR. McCORMICK:    No, Your Honor.

> MR. HESTER:    **No, objection, Your Honor.**

> THE COURT:    All right.  Bring them back in.

> MR. BURRELL:    Your Honor, I'd ask -- the defendant is leaving his left arm out and pulling his shirt up.

THE COURT:        No. No. Put your hands to your side.

(JURY IN)

THE COURT:        Ladies and gentlemen, I've received your note. You have received all the evidence, and you have been instructed as to the law. Continue your deliberations.

(JURY OUT)

THE COURT:        Have you got a problem, Mr. Johnson?

THE DEFENDANT:        I asked could I talk to the judge.

THE COURT:        No. I have the note here, and I'm going to mark it for purposes of identification - - well, into evidence, actually, on Court's Exhibit 1. It will not go back to the jury. They wrote it, sent it out. Do you have any objection, state?

MR. McCORMICK:        No, Your Honor.

THE COURT:        Defense?

MR. HESTER:        No objection, Your honor.

THE COURT:        Court's Exhibit 1. We are in recess.

(Emphasis added). Daryl argues on appeal that this constitutes reversible error because his defense was based on mistaken identity. Specifically, Daryl argues that he should have been allowed to show his arms to the jury when they were brought back into the courtroom to receive the trial court's instructions concerning the note. Daryl claims that this would be new evidence because "[t]he jury had the video from the April 11 incident—which showed a man's left arm—and the jury was apparently having trouble remembering where and what

30

markings [he] had on his left arm." Notably, at trial the defense did not object to the court reminding the jury that they had been instructed on the law, and the defense never moved to have the evidence re-opened in light of the jury's question. Now, however, Daryl argues both for the first time on appeal.

¶41. "The standard of review regarding the admission or exclusion of evidence is abuse of discretion." *Johnson v. State*, 872 So. 2d 733, 734 (¶4) (Miss. Ct. App. 2004). The trial court has judicial discretion when deciding whether or not to reopen a case for the purpose of receiving more evidence. *Perkins v. State*, 253 Miss. 652, 655, 178 So. 2d 694, 695-96 (1965). The Mississippi Supreme Court in *Perkins* explained:

> [W]hen a case is reopened for the reception of further evidence, it must be done in such a manner that the rights of all parties will be protected and ample opportunity afforded them for cross-examination or rebuttal, and even for requesting additional instructions, if the matters introduce should reasonably require them.

*Id*. at 655, 178 So. 2d at 696. In this case, viewing Johnson's tattoos again was not "reasonably required." At that point, the jury had seen the video of the April 11 purchase. Jurors heard testimony from Terry that he did not have a tattoo on the inside of his left forearm. The jury also heard Daryl testify that he had a "Colt .45" tattoo on the inside of his left-forearm. In fact, Daryl displayed the left forearm tattoo for the jury during his direct examination. There was no new evidence for the jury to consider.

¶42. The issue of identification was the central issue for the jury to decide in this case. The jury heard Daryl testify that he was not the man in the video and that it was his brother,

31

Terry, in the video. Further, the jury was shown Daryl's left arm, and they were able to see Terry and Daryl stand side-by-side next to a still-shot of the April 11 video. Regardless of the significant evidence from the State, the defense only presented testimony that the man in the video was not Daryl. That testimony, coupled with Daryl's displaying his tattoos to the jury, gave the jury ample evidence to consider in determining the facts of the case. The trial court did not abuse its discretion in refusing to sua sponte[14] reopen the evidence and allow Daryl to display his tattoos for a second time during jury deliberations. This issue is therefore without merit.

> **V.      Whether the State presented sufficient evidence to support Daryl's convictions, or whether the jury's verdict was against the overwhelming weight of the evidence.**

¶43.    Daryl argues that the evidence was insufficient to support his conviction. In the alternative, Daryl argues that the verdict of the jury was against the overwhelming weight of the evidence. We consider each below and find there was sufficient evidence to support Daryl's convictions and that the verdict was not against the overwhelming weight of the evidence.

### A.      Sufficiency of the Evidence

¶44.    Daryl claims that the trial court erred by denying his motion for judgment notwithstanding the verdict (JNOV). "A motion for [judgment notwithstanding the verdict] challenges the sufficiency of the evidence presented to the jury." *Sacus v. State*, 956 So. 2d

---

[14] At trial, the defense never asked the trial court to reopen the evidence.

329, 334 (¶12) (Miss. Ct. App. 2007). This Court reviews challenges to the sufficiency of the evidence as de novo. *Sanford v. State*, 247 So. 3d 1242, 1244 (¶10) (Miss. 2018). In addressing claims of whether the evidence was sufficient to support a conviction, the question is whether "any reasonable trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Harris v. State*, 977 So. 2d 1248, 1250 (¶10) (Miss. Ct. App. 2008) (internal quotation marks omitted) (quoting *Bush v. State*, 895 So. 2d 836, 844 (¶16) (Miss. 2005), *overruled on other grounds by Little v. State*, 233 So. 3d 288, 292 (¶¶19-20) (Miss. 2017)). If so, then this Court is bound to uphold the jury's verdict. *Id*. It is not this Court's job to decide "whether we think the State proved the elements. Rather, we must decide whether a reasonable juror could rationally say that the State did." *Poole v. State*, 46 So. 3d 290, 293-94 (¶20) (Miss. 2010).

¶45. Mississippi Code Annotated section 41-29-139 (Rev. 2013) provides that it is unlawful to sell or distribute a controlled substance. During the trial, the State presented the jury with ample evidence to consider as to whether Daryl was the person in the video who sold Young cocaine on April 10, 2014, and April 11, 2014: (a) eyewitness testimony from Young that it was Daryl Johnson who had sold her cocaine on both occasions and that it was Daryl Johnson who was in the video; (b) testimony from Detective Wuest that the person in the video was Daryl Johnson; (c) testimony from Sergeant Fore that the person in the video was Daryl Johnson; (d) testimony from Sergeant Gibbons that the individual in the video was Daryl Johnson; (e) video from the April 11 transfer; (f) testimony from Terry Johnson that

33

he does not have a tattoo on his left forearm; (g) testimony from Daryl Johnson that he does have a tattoo on his left forearm; (h) additional testimony from the State's witnesses that "D.J." or "Roughhouse" sold Young cocaine on April 10 and April 11 and that Daryl goes by both nicknames; and (i) further testimony from Young that she knew Daryl to be the man with gold teeth and tattoos that she purchased cocaine from on April 10 and April 11.

¶46. It is indisputable that the jury is the trier of fact. *Brown v. State*, 764 So. 2d 463, 467 (¶9) (Miss. Ct. App. 2000). It is the jury's responsibility to "listen to the evidence, observe the demeanor of the witnesses, and decide the issue of the credibility of the witnesses and what weight to give to any particular piece of evidence." *Id*. "[T]he jury is the sole judge of the credibility of witnesses, and the jury's decision based on conflicting evidence will not be set aside where there is substantial and believable evidence supporting the verdict." *Cantrell v. State*, 224 So. 3d 1278, 1281 (¶15) (Miss. Ct. App. 2017) (quoting *Whitlock v. State*, 47 So. 3d 668, 675 (¶21) (Miss. 2010)). In reviewing the evidence in the light most favorable to the State, a rational juror could have found that the State proved each element needed to convict Daryl. The evidence was sufficient to support the conviction, and the trial court did not err in denying Daryl's JNOV motion.

### B. Overwhelming Weight of the Evidence

¶47. Daryl also claims that the trial court erroneously denied his initial motion for a new

34

trial.[15] A motion for a new trial, even when made jointly with a motion for a JNOV, has its own standard of review; the motion for a new trial here challenges the weight of the evidence. *Daniels v. State*, 107 So. 3d 961, 963 (¶12) (Miss. 2013). The question before this Court is whether or not the trial court abused its discretion. *Id*. This Court will "disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Little*, 233 So. 3d at 289 (¶1). It is not, however, this Court's job to "re-weight evidence," determine the credibility of witnesses, or "resolve conflicts between evidence." *Id*. Those questions are for the jury to consider.

¶48. As described above, the jury was given sufficient evidence to determine whether Daryl committed the crime. After hearing all of the evidence, weighing the credibility of the witnesses, and resolving any conflicting evidence, the jury returned a verdict of guilty. In viewing the evidence in the light most favorable to the verdict, we do not find that the jury's verdict was against the overwhelming weight of the evidence, and the trial court did not abuse its discretion in denying Daryl's JNOV motion and his motion for a new trial.

## VI. Whether the State presented false testimony.

¶49. Daryl, pro se, also claims that the State presented false testimony at one of his post-

---

[15] Daryl's counsel filed a motion for a JNOV or, in the alternative, a motion for a new trial on March 18, 2016. On March 24, 2016, and May 31, 2016, Daryl filed two pro se motions that were both titled as a motion to amend the JNOV or, in the alternative, the motion for a new trial. He filed a third pro se motion for a new trial and a JNOV on September 20, 2017. We discuss the March 18, 2016 motion in part V and reserve discussion on Daryl's pro se motions for part VII of this opinion.

trial hearings. Daryl specifically claims that Nicholas Olds, a Gulfport Police Officer, lied and presented false information concerning securing the arrest warrant for Daryl. Daryl called Officer Olds as a witness in support of his pro se post-trial motions. Daryl appears to argue that Officer Olds committed perjury by claiming Young went **inside** the Johnson & Johnson to purchase drugs. Notably, Officer Olds was never called to testify at trial. Additionally, the defense never made the argument at trial that the arrest was invalid based on false testimony from the arresting officer.

¶50. "The prosecution violates the defendant's rights under the Fourteenth Amendment to the United States Constitution when it knowingly presents false evidence or allows it to go uncorrected when it appears." *Robinson v. State*, 247 So. 3d 1212, 1235 (¶59) (Miss. 2018), *cert. denied* 139 S. Ct. 829 (2019). To prove the defendant's rights have been violated, a defendant "must first demonstrate that a prosecution witness knowingly provided false testimony." *Id.* at (¶59) (citing *Havard v. State*, 86 So. 3d 896, 901 (Miss. 2012)). A new trial is appropriate when the false testimony has "any reasonable likelihood" that may "affect the judgement of the jury." *Id.* (citing *Napue v. Illinois*, 360 U.S. 264, 271 (1959)).

¶51. Daryl is unable to meet his burden to prove that Olds "knowingly provided false testimony" in his affidavit supporting the arrest warrant. Even so, whether or not Young purchased drugs "inside" or "outside" of the Johnson & Johnson is irrelevant. She testified that she purchased cocaine from Daryl on April 10, 2014, and April 11, 2014. She was able to positively identify Daryl as the person she had purchased cocaine from on those two

36

occasions. Olds's affidavit and post-trial testimony about how the arrest warrant was obtained did not contribute to Daryl's conviction. Instead, the overwhelming evidence at trial secured Daryl's conviction. As such, this Court finds this issue is without merit.

### VII. Whether the trial court erred in denying the defense's motion for a new trial based on "new evidence."

¶52. The trial court held a hearing on Daryl's attorney's motion for a new trial and the three pro se motions for a new trial that Daryl had filed. Specifically, the trial court found as follows:

> At trial, the evidence discussed in Petitioner's pro se motions was admitted through testimony of his brother. Further, counsel for Petitioner did not object at trial about the timeliness of receiving any of the evidence. Petitioner was identified as the person selling cocaine on the audio and video made by the confidential informant. All evidentiary or procedural rulings made by the Court were supported by case law. As such, the Court finds that the Petitioner's motions are without merit.

This Court looks at whether the trial court abused its discretion when determining if it was error to deny a motion for a new trial. *Bridgeman v. State*, 58 So. 3d 1208, 1216 (¶40) (Miss. Ct. App. 2010) (citing *Ormond v. State*, 599 So. 2d 951, 962 (Miss. 1992)).

¶53. Further, Daryl argues that he is entitled to a new trial based on the recordings of Tyrice and Young that were allegedly withheld from the defense. In considering whether a defendant is entitled to a new trial based on newly discovered evidence, the trial court must ask whether "(1) the evidence will probably produce a different result or verdict; (2) the evidence has been discovered since trial and could not have been discovered before trial by the exercise of due diligence; (3) it is material to the issue; and (4) it is not merely cumulative

37

or impeaching." *Id.*

¶54. Here, Daryl is not entitled to a new trial because the new evidence he claimed in his motions was all available to him at trial. A review of the record shows that Daryl filed extensive post-trial motions in an effort to re-litigate the charges he was found guilty of. Daryl complained that the State withheld a recording of Young during which she stated that she could not tell Terry and Daryl apart. As discussed above in part I, the defense had that recording before trial. This is not newly discovered evidence. In fact, Young clarified for the jury at trial that she had no issue identifying Johnson during the April 10 and April 11 transactions, and Hester did not cross-examine her on her identification of Daryl on those dates. The State also had several law enforcement officers testify that the person in the April 11 video was Daryl. The record is silent as to any "newly discovered evidence" after trial that would have changed the outcome of the jury's verdict. As such, we find this issue has no merit.

### VIII. Whether the trial court erred in declining to appoint an attorney to represent Daryl at the hearing on his post-trial motions.

¶55. It is Daryl's contention that he was unlawfully denied his right to counsel during his post-trial proceedings. During one of the post-trial hearings, the following exchange occurred:

THE COURT:        . . . You fired your lawyer, Mr. Michael Hester, who's here. I assume he's here for a subpoena, in response to a subpoena, and you said you wanted to represent yourself; is that right?

THE DEFENDANT: That's when you told me I wasn't entitled to a lawyer on a motion for new trial, and then later on you appointed me Mr. Damian Holcomb to do these subpoenas.

THE COURT: No, no. No, no. Let's get this straight and let's get it straight right off the bat because you're talking out of both sides of your mouth. You said you wanted to fire him and you said you wanted to go forward on your own, and now you keep saying now you want a lawyer. What is it?

THE DEFENDANT: **I don't want no lawyer, Your Honor.**

THE COURT: Okay. I just wanted to make sure I had all that. And I got Mr. Damian Holcomb to assist you because you were having trouble getting subpoenas out.

THE DEFENDANT: Yes, sir.

(Emphasis added). Notably, Daryl expressly stated he did not want an attorney. His trial counsel did assist him in preparing his post-trial motions and actually testified in support of the post-trial motions. Further, the trial court ordered another attorney, Holcomb, to assist Daryl in issuing subpoenas in support of his post-trial motions. Daryl chose to fire Hester as his attorney and proceed pro se during his post-trial proceedings. The trial court did not abuse its discretion, and this issue has no merit.

### IX. Whether the cumulative effect of the errors requires reversal.

¶56. Finally, Daryl argues that the cumulative error doctrine demands this Court reverse. "Under the cumulative-error doctrine, individual errors may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of

39

a fundamentally fair trial." *Ross v. State*, 954 So. 2d 968, 1018 (¶138) (Miss. 2007).

"However, where there is no error in part, there can be no reversible error to the whole."

*Harris v. State*, 970 So. 2d 151, 157 (¶24) (Miss. 2007). Because we find that Daryl's other

issues on appeal are without merit, there can be no cumulative error. This issue is without

merit.

¶57. **AFFIRMED.**

**BARNES, C.J., CARLTON AND J. WILSON, P.JJ., GREENLEE, WESTBROOKS, TINDELL, McDONALD AND C. WILSON, JJ., CONCUR. McCARTY, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS AND McDONALD, JJ.**

**McCARTY, J., SPECIALLY CONCURRING:**

¶58. While I agree with the majority's thoughtful consideration of this appeal, I write

separately regarding the limitation of the number of witnesses the defendant was allowed to

present at trial. The defendant should have been allowed to call the witnesses he sought

because his liberty was at stake. And in our United States, "[f]ew rights are more

fundamental than that of an accused to present witnesses in his own defense." *Chambers v.*

*Mississippi*, 410 U.S. 284, 302 (1973).

¶59. This is as ingrained a rule as we have in our now two-hundred-plus years of

jurisprudence as a country and a State. For "[w]hether rooted directly in the Due Process

Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses

of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful

opportunity to present a complete defense." *Holmes v. South Carolina*, 547 U.S. 319, 324

(2006) (internal quotation marks omitted).

¶60. Our Rule 611 allows a trial court to manage the presentation of evidence, but curtailing evidence of this type in a criminal trial is to be done *reasonably*. M.R.E. 611(a) ("The court should exercise reasonable control . . . ."). For the procedures are to be "effective for determining the truth." M.R.E. 611(a)(1). As both *Chambers* and *Holmes* declare, it is a fundamental right of the accused to present witnesses to protect them from the power of the State. The accused should be given the benefit of all doubts when his or her liberty is at stake, especially when the evidence goes to a theory of the defense.

¶61. Here, the theory at issue was that the brother, not the defendant, was the person on the tape selling drugs. While the presentation of the opinion of ten or eleven lay witnesses that it was the brother on the tape might be cumulative, weighed against the penalty the defendant faced, it was reasonable.

¶62. It is true that the order of witnesses is within the trial court's discretion. But this discretion should be exercised in the interests of justice and respect of constitutional rights. For "[c]onstitutional rights in serious criminal cases rise above mere rules of procedure." *Brooks v. State*, 209 Miss. 150, 155, 46 So. 2d 94, 97 (1950). There was no need for the State to attack the right of the defendant to present witnesses in his defense when it sought a motion in limine, and there was little need for the trial court to grant it.

¶63. The concern that the constitutional rights of the defendant were ignored is heightened because of the trial court's arbitrary decision to pin the number of witnesses at three. This

41

decision was not based on precedent or rules, as shown by the phrase "I think I'm going to limit it to three." The arbitrary nature of this decision directly implicates the fundamental right of a defendant to present witnesses in his defense. *See Holmes*, 547 U.S. at 319-20 (holding that the "right is abridged by evidence rules that infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve" (internal quotation marks omitted)). While it may not be reversible error in this appeal, there might be other circumstances where it will require immediate reversal.

¶64.    Yet, as pointed out by the majority, the defense did not proffer the substance of just what the excluded witnesses were going to say. The best route is to either ask the trial court to excuse the jury and have the witnesses testify in brief or simply announce for transcription the substance of what the witnesses would have said if they were allowed to have testified.[16] In either event, error is best preserved through this careful proffer. *See* M.R.E. 103(a)(2) (explaining how to preserve error through an offer of proof).

¶65.    It is imperative the constitutional rights of all Mississippians are safeguarded. To best protect those rights, we should only in the rarest circumstances limit the right of an accused to present witnesses in their defense.

**WESTBROOKS AND McDONALD, JJ., JOIN THIS OPINION.**

---

[16] I do believe that in this case there was sufficient context to understand the general contours of what the witnesses would say—that it was not the defendant on the tape—to preserve error for appeal. *See* M.R.E. 103(a)(2) ("[I]f the ruling excludes evidence, a party informs the court of its substance by an offer of proof, *unless the substance was apparent from the context*." (emphasis added)). Because the majority proceeds to address the substance of the defendant's claim, this point is mooted.